COURT OF APPEALS OF VIRGINIA


Present:  Judges Elder, Humphreys and Senior Judge Willis
Argued at Chesapeake, Virginia


RONALD RAY SHEPARD

                                MEMORANDUM OPINION[*] BY
v.       Record No. 2881-06-1        JUDGE ROBERT J. HUMPHREYS
                                 OCTOBER 9, 2007
CITY OF PORTSMOUTH DEPARTMENT
  OF SOCIAL SERVICES


FROM THE CIRCUIT COURT OF THE CITY OF PORTSMOUTH
James C. Hawks, Judge

Barrett R. Richardson (Richardson and Rosenberg, LLC, on brief),
for appellant.

Shelia C. Riddick, Assistant City Attorney; Romy L. Radin,
Guardian *ad litem* for the minor child (G. Timothy Oksman, City
Attorney; Radin & Radin, P.C., on brief), for appellee.


Ronald Ray Shepard ("Shepard") appeals an order of the City of Portsmouth Circuit

Court ("trial court") terminating his residual parental rights to his minor child, J.M., pursuant to

Code § 16.1-283(C)(1). Specifically, Shepard contends the evidence was insufficient to

terminate his parental rights, due to his efforts to rehabilitate his life upon release from

incarceration and the lack of an opportunity to establish a meaningful relationship with J.M. For

the following reasons, we affirm the judgment of the trial court.

ANALYSIS

Shepard contends that the evidence was insufficient to terminate his parental rights under

Code § 16.1-283(C)(1) due to his efforts to rehabilitate his life upon release from incarceration

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

and his lack of an opportunity to establish a relationship with J.M. prior to the termination hearing. We disagree.

It is well settled that "[w]hen addressing matters concerning a child . . . the paramount consideration of a trial court is the child's best interests." Logan v. Fairfax County Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991). "In matters of a child's welfare, trial courts are vested with broad discretion in making the decisions necessary to guard and to foster a child's best interests." Farley v. Farley, 9 Va. App. 326, 328, 387 S.E.2d 794, 795 (1990). "Statutes terminating the legal relationship between parent and child should be interpreted consistently with the governmental objective of preserving, when possible, the parent-child relationship." Weaver v. Roanoke Dep't of Human Resources, 220 Va. 921, 926, 265 S.E.2d 692, 695 (1980). The trial court's judgment, "'when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it.'" M.G. v. Albemarle County Dep't of Soc. Servs., 41 Va. App. 170, 181, 583 S.E.2d 761, 766 (2003) (quoting Peple v. Peple, 5 Va. App. 414, 422, 364 S.E.2d 232, 237 (1998)).

Code § 16.1-283(C)(1) provides:

> The residual parental rights of a parent . . . of a child placed in foster care . . . may be terminated if the court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that:
>
> The parent or parents have, without good cause, failed to maintain continuing contact with and to provide or substantially plan for the future of the child for a period of six months after the child's placement in foster care notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to communicate with the parent or parents and to strengthen the parent-child relationship. Proof that the parent or parents have failed without good cause to communicate

on a continuing and planned basis with the child for a period of six
months shall constitute prima facie evidence of this condition . . . .[1]

Thus, to grant PDSS's petition for termination pursuant to Code § 16.1-283(C)(1), the trial court was required to find by clear and convincing evidence that (1) termination was in the best interests of J.M.; (2) PDSS made "reasonable and appropriate" efforts to communicate with Shepard and strengthen Shepard's relationship with J.M.; (3) Shepard failed, without good cause, to maintain continuing contact with J.M. for a six-month period following J.M.'s placement in foster care; and (4) Shepard failed, without good cause, to provide or substantially plan for J.M.'s future for a six-month period following J.M.'s placement in foster care.

## I. The Best Interests of the Child

PDSS was first required to prove that termination of Shepard's parental rights was in J.M.'s best interest. The record contains evidence to support this finding.

J.M. has bonded with his current foster parents and considers them his natural parents. His sister, with whom he is extremely close, also lives with his foster parents, who wish to adopt them both. Although J.M. is developmentally delayed, he has made significant progress while living with his foster parents, in that he is now able to dress himself, is less afraid of speaking to people, and is now "fully potty trained."

By contrast, J.M. has no relationship with Shepard at all. According to J.M.'s therapist, J.M's. behavior would likely regress if he were removed from his foster parents' home. Thus, the record contains evidence from which the trial court could find that J.M.'s emotional needs

---

[1] Although proof that the parent or parents have failed without good cause to communicate on a continuing and planned basis with the child for a period of six months shall constitute prima facie evidence of a parent's failure to provide or plan for the child's future, the trial court specifically found both that Shepard had failed to consistently communicate with J.M. *and* that Shepard had not planned for J.M.'s future.

are best suited by remaining with his foster parents. The trial court could find from the evidence that separation from his foster parents and sister could affect his emotional well-being and adversely affect his development. Moreover, J.M.'s foster parents are familiar with his educational and medical issues. J.M. requires special education and sees a speech therapist two to three times a week. J.M. also has medical problems that require specialized attention.

On this evidence, the trial court could properly find that the foster parents are more suited to caring for J.M. than Shepard, who is unfamiliar with J.M.'s special needs. Thus, the trial court's finding that termination was in J.M.'s best interests is supported by the record.

II. PDSS's Reasonable and Appropriate Efforts to Communicate with Shepard

PDSS was next required to prove that it made "reasonable and appropriate" efforts to communicate with Shepard and strengthen Shepard's relationship with J.M. "'Reasonable and appropriate' efforts can only be judged with reference to the circumstances of a particular case." Ferguson v. Stafford County Dept. of Soc. Servs., 14 Va. App. 333, 338, 417 S.E.2d 1, 9 (1992).

Rukin, J.M.'s therapist, expressed her professional opinion that it "would have been very difficult" for PDSS to offer Shepard services to help him establish a closer relationship with J.M., given the fact that Shepard was incarcerated in distant Florida and the child's young age. Nevertheless, the record contains evidence supporting the finding that PDSS made "reasonable and appropriate" efforts, given the circumstances, to communicate with Shepard and establish a relationship between Shepard and J.M.

PDSS first contacted Shepard in March 2004, to inform him that J.M. was in the care of PDSS and that J.M's mother had named him as J.M.'s father. In February 2005, PDSS mailed Shepard a copy of its "Foster Care Service Plan Review." Through this review, PDSS informed Shepard that he was expected to take parenting classes, maintain contact with PDSS and J.M. at least every two weeks, and obtain stable employment and secure housing upon his release from

incarceration, if he expected to have any part in J.M.'s future. In October 2005, PDSS informed Shepard that it was changing its goal for J.M. from "return to home" to "adoption." At this time, PDSS suggested that Shepard participate in parenting and anger management classes, and sex offender treatment while incarcerated. Even after PDSS changed J.M.'s goal to "adoption," it continued its attempts to place J.M. with Huber, Shepard's sister. Although Huber did not take advantage of the opportunity, PDSS offered her the chance to engage in supervised visitation with J.M. PDSS also initiated the ICPC report on Huber's home in Quincy, which ultimately deemed Huber's home unsuitable. Furthermore, PDSS sent Shepard photographs of J.M. while he was still incarcerated and generally attempted to keep Shepard informed of J.M.'s status in foster care. Although PDSS refused Shepard the privilege of supervised visitation with J.M. at Rukin's recommendation, Rukin presumably made this recommendation out of concern for J.M.'s emotional well-being.[2]

PDSS remained in contact with Shepard and investigated the possibility of placing J.M. with Huber, despite the low probability of Shepard and J.M. establishing a relationship. Thus, given the circumstances, the record contains ample evidence from which the trial court could find that PDSS made "reasonable and appropriate" efforts to communicate with Shepard and strengthen his relationship with J.M.

Relying on Harris v. Lynchburg Div. of Soc. Servs., 223 Va. 235, 288 S.E.2d 410 (1982), Shepard argues PDSS should have offered him services *after* his release from incarceration and given him the opportunity to engage in supervised visitation with J.M. In Harris, the Supreme Court of Virginia reversed a trial court's termination of a father's parental rights when the

---

[2] The record is silent as to why Rukin recommended denying Shepard's request for visitation.

evidence showed that the local social services agency did not offer any services or assistance to the father in attempts to remedy the conditions that led to his children being placed in foster care. Id. at 243-44, 288 S.E.2d at 415. The Court held that assistance in correcting the conditions requiring foster care is required, and, because social services did not offer assistance, the court remanded the case to allow the father this opportunity. Id. at 244, 288 S.E.2d at 415.

Shepard's reliance on Harris is misplaced. In Harris, social services offered the father no services at all. Here, PDSS provided services, and made reasonable efforts to assist in strengthening Shepard's relationship with J.M. Neither Code § 16.1-283(C)(1) nor Harris requires a social services agency to provide services to an incarcerated parent subsequent to that parent's release from incarceration.

### III. Shepard's Failure to Communicate with J.M.

PDSS next had to prove that Shepard failed to maintain continuing contact with J.M. for a six-month period following J.M.'s placement in foster care. In October 2005, Shepard sent J.M. a picture of himself, and, around Christmas of 2005, Shepard sent J.M. a letter and a Christmas card. Although Shepard was incarcerated during this period, nothing in the record indicates that he was restricted from sending mail to J.M. The next time Shepard attempted to communicate with J.M. was seven months later, on July 28, 2006, when he requested supervised visitation with J.M. through his attorney. As of October 24, 2006, the date of the termination hearing, Shepard had not communicated with J.M. any further. J.M. was in foster care this entire period. Thus, the record contains evidence that Shepard failed, without good cause, to maintain continuous contact with J.M. for a six-month period following J.M.'s placement in foster care.

IV.  Shepard's Failure to Provide or Plan for J.M.'s Future

Finally, under the statute, PDSS was required to prove that Shepard failed, without good cause, to provide for *or* to substantially plan for J.M.'s future for a period of six months after the child's placement in foster care.  The record supports the latter finding.

Shepard had not researched or contacted any pediatricians for J.M. to see in Florida, which is especially important given J.M.'s medical issues.  He had given no serious thought to providing after-school childcare for J.M. while he was at work.  Instead, he made the vague statement that he would "look for a job and find a job that lets me be with [J.M.] and help [J.M.] and also work at the same time and make money."  While Shepard had found full-time employment in the rather short period since his release, he was unfamiliar with the benefits the job provided and was unsure of the health insurance coverage that would be available to J.M.  While Shepard knew the name of the elementary school J.M. would attend were he to live in Quincy, he did not appear to have considered any of J.M.'s special needs, such as his special education requirements or his speech therapy.  Furthermore, Shepard did not know the name of the local social services agency in Quincy.  Finally, while Shepard claimed to have been saving money for a parenting class, he was unable to name the organization offering the class.

Shepard may have been at somewhat of a disadvantage and unable to specifically make these plans due to his incarceration, but incarceration does not completely prevent a parent from planning for a child's future.  While incarcerated, Shepard could have planned what he needed to do for J.M. after his release and then, once released, taken steps to implement them.  Shepard's inaction during the three months since his release provides evidence from which a fact finder could infer a failure to plan during the three months *prior* to his release.

Shepard's efforts to improve his life after his release by obtaining employment and remodeling his home are commendable.  Nevertheless, the record supports a finding that Shepard

failed to *substantially* plan for J.M.'s future, without good cause, over a six-month period, after J.M.'s placement in foster care.

Shepard also argues that the evidence was insufficient to terminate his parental rights over J.M. because no evidence indicated that he was an unfit parent. However, this argument ignores the Supreme Court of Virginia's holding in <u>Knox v. Lynchburg Div. of Soc. Servs.</u>, 223 Va. 213, 220, 288 S.E.2d 399, 403 (1982), in which the Court stated that the trial court

> is required to find both that the termination of parental rights will promote the best interests of the child and that [the] factors listed in [Code § 16.1-283(C)(1)] are present. Once the court finds these factors are present, it need not make a further finding of parental unfitness. In our opinion, a finding that the factors exist is tantamount to a finding of parental unfitness.

Therefore, we reject Shepard's argument in this regard.

CONCLUSION

For the reasons stated herein, we hold that the evidence was sufficient for the trial court to find that termination of Shepard's parental rights over J.M. was in J.M.'s best interest and that Shepard, for a six-month period, failed to maintain continuous contact with J.M. and further failed to substantially plan for J.M.'s future. Thus, the trial court did not err in terminating Shepard's parental rights under Code § 16.1-283(C)(1).[3] Accordingly, we affirm the judgment of the trial court.

<u>Affirmed.</u>

---

[3] PDSS argues on brief that the trial court erred by not admitting the ICPC report in its entirety, into evidence, and in failing to terminate Shepard's parental rights under Code § 16.1-283(C)(2). We decline to address either of these arguments, both because they are now moot and because PDSS did not designate these as questions presented on cross-appeal, as required by Rule 5A:21(b).