COURT OF APPEALS OF VIRGINIA

Present:   Judges Alston, Chafin and Senior Judge Haley
Argued at Fredericksburg, Virginia

**UNPUBLISHED**

YEILY SANDOVAL RIOS

v.          Record No. 0385-16-4

FAIRFAX COUNTY DEPARTMENT
 OF FAMILY SERVICES

MEMORANDUM OPINION* BY
JUDGE ROSSIE D. ALSTON, JR.
DECEMBER 19, 2017

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Brett A. Kassabian, Judge

(John B. Jacob, Jr., on brief), for appellant.  Appellant submitting
on brief.

(Elizabeth D. Teare, County Attorney; Karen L. Gibbons, Deputy
County Attorney; Donna R. Banks, Assistant County Attorney;
Nancy J. Branigan Martin, Guardian *ad litem* for the minor child,
on brief), for appellee.  Appellee and Guardian *ad litem* submitting
on brief.

Yeily Sandoval Rios (appellant) appeals the termination of her parental rights over her

daughter, J.  She contends that the trial court erred in ruling that she did not substantially remedy

the conditions which led J. to be placed in and remain in foster care.  Appellant specifically

argues that the trial court reached this determination without clear and convincing evidence as

required by Code § 16.1-283(C)(2).

BACKGROUND

J. was placed under the care of Fairfax County Department of Family Services

(Department) pursuant to an emergency removal order.  The Department noted in the supporting

affidavit that appellant was adjudicated as having abused or neglected her eldest children, Jo. and

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

L., ages three and two respectively. The juvenile and domestic relations district (J&DR) court considered the facts contained within the affidavit and subsequently entered the order. At the preliminary removal hearing, the Department examined several of its employees and offered the supporting affidavit as evidence. The J&DR court found that J. was to remain in the Department's care because, otherwise, she "would be subject to an imminent threat to life or health to the extent that severe or irremediable injury would be likely to result if [she] were returned to or left in the custody of . . . her parents." The J&DR court further ordered appellant to

> participate in a psychological evaluation; continue to follow through with any services previously ordered by the Department concerning the siblings of [J.; which included] . . . having [and continuing] supervised visits with the children[,] . . . arriving [at] . . . the visits and medical appointments for the children[ on time, scheduling prenatal care for J.,] sign[ing] releases[,] notify[ing] the Department of any changes in their address or phone number within 24 hours, . . . [and] provid[ing] the Department with the names and addresses of family members [and] extended family members who could possibly be a resource for the child.

The Department expressed concerns regarding the uncertain paternity of J., appellant's unstable housing situation, her lack of preparation for J.'s birth, and her overall inability to parent. These were the circumstances that originally caused J. to be placed in foster care. Appellant objected to the J&DR court entering a finding of abuse and neglect, so an adjudicatory hearing was scheduled.

At the adjudicatory hearing, the J&DR court found that J. was either "at risk of being [or was] abused or neglected by a parent . . . who has been adjudicated as having abused or neglected another child in the care of the parent." The J&DR court by order re-entered the remedial requirements necessary for appellant to be reunited with her children. A dispositional hearing and foster care hearing were scheduled. The Department submitted its foster care plan; its primary goal for J. was return home with a concurrent goal of relative placement. The J&DR

court approved the plan.  At the foster care review hearing, the J&DR court approved those same goals "because the Department was providing services to appellant which would hopefully improve conditions [that] caus[ed] J. to be placed in foster care."

After appellant did not substantially remedy those conditions, the Department simultaneously filed a petition to set a permanency planning hearing and initiated proceedings to terminate appellant's parental rights.  At the permanency planning hearing, the Department submitted a new foster care plan, changing its goals from return home and relative placement to adoption.  The Department explained this change by referencing their "mandate as foster care workers to achieve permanency for children in a period not to exceed 12 months."  The J&DR court approved the new plan and terminated appellant's parental rights over J. as being "in the best interest of the child."

Appellant appealed to the circuit court ("trial court").

At trial, the Department's witnesses testified to appellant's efforts to remedy conditions placing J. in foster care.  Those conditions are that appellant:  undergo a psychological evaluation, attend visitation and medical appointments in a timely fashion, provide prenatal care for J., sign releases, notify the Department of changes in address or phone number within 24 hours, and submit names and addresses of family members who were interested in providing J. care.  Appellant did complete her psychological evaluation with Dr. Gloria Morote.  Dr. Morote found that appellant had "modest or limited cognitive abilities[,]" a "low or deficient" attention span and working memory, and challenges with processing information and complex reasoning. Dr. Morote posited that this affected appellant's ability to parent because appellant would have issues in "safe planning," "planning ahead," and "organizing her day to meet demands for her children."  She subsequently recommended that appellant receive case monitoring and home-based services from the Department.

Regarding visitation and medical appointments, appellant was not compliant. She frequently arrived late or missed scheduled visitation citing transportation issues as an excuse. Regarding medical appointments, appellant also arrived late or missed appointments. One Department employee testified that prior to J.'s birth, appellant "could not even get the children to doctors' appointments that [the employee] made for her and . . . brought her to." Appellant was not properly prepared for appointments she did attend. Appellant did not provide car seats, diapers, or extra clothes for the children when transporting them to their medical appointments. In one instance, L. "urinated . . . so much that it was coming out of her diaper." Appellant "did not have clothes, diapers-anything-for L[.]" The children's teachers even reported to the Department that they arrived to school without the proper supplies.

After confirming that appellant was pregnant again, the Department recommended that she schedule prenatal appointments. Appellant failed to do so even after being reminded, so a Department employee scheduled appointments and coordinated transportation for appellant. Appellant arrived late or missed those appointments. At one appointment, appellant forgot photo identification, but a Department employee convinced the clinic to see her regardless. At another appointment, thirty minutes before she was scheduled to be seen, appellant notified a Department employee that she was at a different location and requested that the cab pick her up at a new address. The cab company ultimately did transport appellant to the clinic, but appellant missed her appointment due to her tardiness. While appellant "always expressed an intent to follow through[, she] seemed very overwhelmed." The evidence did establish however that after having missed thirty-six percent of the appointments scheduled for her eldest children and most of J.'s prenatal appointments, appellant never missed an appointment made for J. after J.'s birth. A Department employee testified that appellant did not appreciate the seriousness of her "lack of follow through" on her children's well-being.

Appellant failed to sign releases as required.

Appellant did not inform the Department of changes in address or phone number within the designated 24-hour window.

Appellant was to provide the Department with contact information of individuals who could care for J.  Appellant asked that J. be placed with the Sandovals if the goal of return home was not feasible.[1]  The Sandovals were not a viable option because that couple was previously the eldest children's "safety monitors," and yet they were "not able to provide [proper] care to the [eldest] children and follow through with the safety plan."  Appellant's mother also expressed a desire to care for J. but withdrew her interest.

The Department offered additional services to appellant:  a parenting class and individual domestic violence counseling.  While appellant did enroll in a parenting class, she did not graduate from the course because she did not attend eighty percent of the scheduled classes.  Even when appellant did attend, she did not participate.  On cross-examination, it was noted that appellant attended 13 of 18 sessions.  Because of some history pertaining to her home environment, the Department recommended that appellant attend domestic violence counseling.  Appellant had been and was currently involved with men who were domestic abusers.  Juan Canales (Canales), the biological father of her eldest children, Jo. and L., was physically, emotionally, and verbally abusive.  In interviews, appellant said Canales was controlling, "made all the decisions," and dishonored promises to transport the children to their appointments.  After leaving Canales for the second time, appellant began seeing Fernando Lopez (Lopez), J.'s biological father.  Appellant continued seeing Lopez even after he engaged in a physical altercation with appellant's male colleague, resulting in appellant being fired from her job.  Another report noted that Lopez was a drug dealer and "a violent person."  In addition, Lopez

---

[1] Ms. Sandoval, Juan Canales' sister, is married to appellant's father.

made statements to a Department employee that he grabbed appellant "roughly about the shoulders" during a heated argument in the presence of a child. While appellant did initially attend counseling sessions, she failed to appear for subsequent scheduled sessions.

The Department also recommended that appellant remedy their additional concerns. Those were the uncertain paternity of J., appellant's housing situation, appellant's lack of preparation for J., and appellant's parenting skills. Appellant could not state with certainty who J.'s father was. Canales completed a paternity test and was determined not to be J.'s father. Appellant informed a Department employee that J.'s father may possibly be Lopez. The Department attempted to get Lopez to submit to a paternity test over the course of several months. Lopez ultimately complied, and it was established that he was J.'s biological father. The Department indicated that J. did not have a safe and stable home environment. Due to her turbulent relationships, appellant's living situation was constantly in flux. She moved to six different residences since the spring of 2014. It was often the case that several other adults lived in these dwellings. The Department required that individuals living with or caring for J. submit completed background checks. Appellant was reminded of this at least six times, but she failed to submit the necessary documentation. One of the locations was unsuitable to raise a child because painting and cleaning supplies and equipment lined the living room. In evaluating these living arrangements, Department employees noted that appellant had done very little to prepare for J.'s long-term care. The extent of her preparations included purchasing a bassinet that J. would outgrow within weeks. Appellant failed to develop a plan of care for J. if J. were to return home. This was particularly important because appellant and her current significant other, Lopez, worked overnight; most daycares do not operate at night.

In addition, appellant was required to improve her parenting skills. Prior to J.'s birth, "the [eldest] children were all over the place," and appellant had "a tough time keeping up with

them." Appellant frequently forgot to keep the children in her line of sight, causing Department employees to prompt proper parenting behaviors. On one occasion, Jo. defecated himself, and appellant did not notice until a Department employee made appellant aware of it. Appellant then put both Jo. and L. "into the bathtub but left them there [unattended,] and then went to the hallway to clean up the mess." After J. was born, appellant was still "[unable] to maintain appropriate supervision" over all three children. Appellant continued to require prompts to watch the children and was told to put J. in her high chair while appellant was otherwise occupied. One employee noted that appellant would strap J. in her car seat in the living room. Then, appellant would exit the room to prepare lunch for the other children, "leaving J. in danger of being stepped on." In another visit, appellant placed J. on the couch but did not properly secure her. Upon hearing that her older children were hungry, appellant rose from the couch to ready their lunch. J. then fell three-to-four feet onto the uncarpeted floor, sustaining a bump to her forehead. According to the testimony presented, appellant "makes progress in the moment[,] . . . but the struggle is when you return the following week or the next time, we seem to be back at square one." Although appellant is a "loving and caring mom," several witnesses testified that they did not see any improvement in appellant's parenting.

One Department employee specifically testified to the circumstances confronting J., stating that J. is a "very sweet little girl" who is curious, social, and interested in her older siblings. "She very rarely cries except for when she really needs something . . . and is sleeping through the night." Initially, it was believed that J. was behind in her development, but ultimately, J. has no medical conditions requiring special treatment, unlike her older siblings. Even so, appellant "struggles in caring for children with even basic needs." For example, all children need dental care. When appellant's eldest children came into the Department's care, they had "severe dental decay," and both children ended up requiring dental procedures.

During cross-examination, it was revealed that appellant was employed, elected to enroll in an additional parenting class, and completed some court-ordered services.

Appellant presented no direct evidence.

The trial court approved the Department's goal of adoption and "reluctantly" ordered the termination of appellant's parental rights over J. "because . . . this case is not about whether or not the [appellant] loves her child[,] . . . [it] is not about an unwillingness to substantially remedy [the conditions under Code § 16.1-283(C)(2),] . . . [it] is[ not] about poverty, and it[ is] not about a cognitive defect." The trial court ultimately ruled that there was "little, if any, and certainly not substantial remedy of the conditions that existed at the time the child was placed in foster care." Appellant objected to the trial court's findings.

This appeal followed. Appellant argues that the trial court erred in terminating her parental rights. She specifically contends that the trial court ruled that appellant had not substantially remedied conditions placing J. in foster care without meeting the clear and convincing evidentiary standard as required by Code § 16.1-283(C)(2). We disagree.

ANALYSIS

"When reviewing a termination of a parent's residual parental rights, it would be unfitting to not acknowledge that '[t]he termination of parental rights is a grave, drastic[,] and irreversible action.'" Farrell v. Warren Cty. Dep't of Soc. Servs., 59 Va. App. 375, 400, 719 S.E.2d 329, 341 (2012) (quoting Helen W. v. Fairfax Cty. Dep't of Human Dev., 12 Va. App. 877, 883, 407 S.E.2d 25, 28-29 (1991)). "The effect of an order terminating parental rights is to permanently sever the relationship between a child and her natural parent and to 'render the parent a legal stranger to the child.'" Edwards v. Cty. of Arlington, 5 Va. App. 294, 305, 361 S.E.2d 644, 650 (1987) (quoting Shank v. Dep't of Soc. Servs., 217 Va. 506, 509, 230 S.E.2d 454, 457 (1976)).

"We view the evidence in the 'light most favorable' to the prevailing party in the [trial] court and grant to that party the benefit of 'all reasonable inferences fairly deducible therefrom.'" Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 262, 616 S.E.2d 765, 769 (2005) (quoting Fields v. Dinwiddie Cty. Dep't of Soc. Servs., 46 Va. App. 1, 7, 614 S.E.2d 656, 659 (2005)). "In its capacity as factfinder . . . the [trial] court retains 'broad discretion in making the decisions necessary to guard and to foster a child's best interests.'" Id. at 266, 616 S.E.2d at 769 (quoting Farley v. Farley, 9 Va. App. 326, 328, 387 S.E.2d 794, 795 (1990)). "On review, 'a trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Fields, 46 Va. App. at 8, 614 S.E.2d at 659 (quoting Farley, 9 Va. App. at 329, 387 S.E.2d at 796). The trial court's determinations "when based on evidence heard *ore tenus* . . . will not be disturbed on appeal unless it was plainly wrong or without supporting evidence." Logan v. Fairfax Cty. Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991) (quoting Peple v. Peple, 5 Va. App. 414, 422, 364 S.E.2d 232, 237 (1988)).

Pursuant to Code § 16.1-283(C)(2), a court may terminate parental rights if

> the [trial] court finds, based upon clear and convincing evidence, that it is in the best interests of the child *and* that:
>
> [t]he parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement.

(Emphasis added).

To terminate parental rights "a trial [court] must make two separate inquiries . . . . The first prong is to determine the child's best interests. The second prong relates to the parent's . . . remedying of the conditions that led to foster care . . . which is determined by reference to a particular time frame." Richmond Dep't of Soc. Servs. v. Crawley, 47 Va. App. 572, 579, 625

S.E.2d 670, 673 (2006). "[T]he paramount consideration of a trial court [in this determination] is the child's best interest." Akers v. Fauquier Cty. Dep't of Soc. Servs., 44 Va. App. 247, 262, 604 S.E.2d 737, 744 (2004) (quoting Logan, 13 Va. App. at 128, 409 S.E.2d at 463). When conducting the best interest analysis, several factors are considered, including

> the age and physical and mental condition of the . . . child[], the age and physical and mental condition of the parents; the relationship existing between each parent and each child; the needs of the . . . child[]; the role which each parent has played, and will play in the future, in the upbringing and care of the . . . child[], and such other [necessary] factors.

Crawley, 47 Va. App. at 579-80, 625 S.E.2d at 673-74 (quoting Barkey v. Commonwealth, 2 Va. App. 662, 668, 347 S.E.2d 188, 191 (1986)). Turning to the second prong of the inquiry, a time frame exists to "protect[] the family unit and attendant rights of both parents and child, while assuring resolution of the parent/child relationship without interminable delay." Lecky v. Reed, 20 Va. App. 306, 312, 456 S.E.2d 538, 540 (1995). Clear and convincing is the evidentiary standard required "because 'the rights of parents may not be lightly severed.'" Toms, 46 Va. App. at 266, 616 S.E.2d at 770 (quoting M.G. v. Albemarle Cty. Dep't of Soc. Servs., 41 Va. App. 170, 187, 583 S.E.2d 761, 769 (2003)).

We view the evidence in the light most favorable to the Department, the prevailing party at the trial court. Id. at 262, 616 S.E.2d at 769 (citing Fields, 46 Va. App. at 7, 614 S.E.2d at 659). So viewed, we find that the trial court did not err when it terminated appellant's parental rights pursuant to Code § 16.1-283(C)(2).

I. Termination is in the best interest of the child.

In review on appeal as to whether termination of parental rights is appropriate, we first consider whether it is in a child's best interest. It is not in J.'s best interest for her to be returned to appellant's care for several reasons. Although appellant loves J., appellant has not and cannot

provide J. the care she needs, has not improved her parenting, and has not provided a safe and stable home for J.

J. is a "very sweet little girl" who is curious, social, and interested in her older siblings. "She very rarely cries except for when she really needs something[,] . . . and is sleeping through the night." J. has no medical conditions or developmental issues requiring special attention. Regardless, appellant "struggles in caring for children with even basic needs." For example, all children require dental care; upon being placed in the Department's care, appellant's eldest children suffered from severe dental issues. In addition, appellant did not provide adequate prenatal care for J. Appellant either missed or arrived late to scheduled appointments. Appellant has not prepared for J.'s return home, and while appellant has found employment, she has not crafted a long-term care plan for J. This is significant because both appellant and Lopez work at night, and most daycares do not provide nighttime care. Appellant has not improved her parenting over the past several years. Appellant has trouble supervising her three children and requires frequent prompts to act appropriately. Finally, appellant continued relationships with domestic abusers. And due to appellant's turbulent romantic affairs, appellant's housing situation has constantly been in flux. It is unclear where appellant will raise J. if J. is returned to her care. Several locations where appellant has lived since the spring of 2014 are unsuitable because other adults living in those dwellings did not submit the requisite background checks and one poses an additional danger to J. because painting and cleaning supplies lined the living room walls.

II. Appellant failed to substantially remedy conditions.

The following conditions caused J. to be placed in foster care: appellant

> [was] not able to follow through with the services that were recommended by the Department, which included visitation with the other children, psychiatric evaluations, [attending the children's] medical appointments, [providing prenatal care for J.,

> signing releases, informing the Department of changes in address, providing names of those interested in caring for J., participating in a parenting class, and undergoing individual counseling], in addition to the unknown [paternity of J.], [appellant's] overall inability to parent this child[, appellant's uncertain housing situation, and appellant's lack of preparation] for the child.

While appellant underwent a psychiatric evaluation, she did not follow through with attending visitation and medical appointments in a timely manner, did not complete the recommended parenting class, and did not provide prenatal care for J. Appellant was consistently late or missed scheduled visitation due to transportation issues. Regarding her children's medical appointments, appellant arrived late or missed appointments for the same reasons. Appellant failed to appreciate the significance of missing or arriving late to appointments on her children's well-being. Appellant was unprepared for appointments she was able to attend-she did not bring necessary supplies for the children like diapers or car seats. In one instance, while travelling to an appointment prior to J.'s birth, L. urinated through her diaper. Appellant did not have any additional diapers or a change of clothes for L. While the Department was attempting to assist appellant in remedying the conditions placing the children in jeopardy, appellant became pregnant again, and the Department encouraged prenatal care. Appellant did not schedule any appointments; therefore, Department employees scheduled appointments on appellant's behalf. Appellant arrived late and was not seen at one of these appointments, and at another, while appellant did not bring proper identification, ultimately a Department employee convinced the clinic to see her. Appellant also failed to sign releases and did not inform the Department when her address or phone number changed within 24 hours. Regarding the parenting class, appellant did not graduate from the course because she did not meet the eighty percent attendance bench-mark. While close to achieving the attendance requirement, appellant did not engage in the classes she did attend.

Determining the paternity of J. was problematic for the Department. Appellant did not know who J.'s father was. After a paternity test established Canales was not the father, appellant informed Department employees that Lopez could possibly be J.'s father. Over several months, the Department attempted to get Lopez to submit to a paternity test. He eventually complied; Lopez was determined to be J.'s father.

Appellant did not create a stable and safe environment for J. Due to her past, appellant was directed to complete domestic violence counseling. Appellant did initially see her counselor but did not attend subsequent scheduled counseling sessions. Appellant was still romantically involved with and lived with a domestic abuser, Lopez. As a result of her turbulent relationships, appellant changed residences constantly; she moved to six different locations since the spring of 2014. In several locations, appellant lived with multiple people. Appellant was required to submit background checks on individuals caring for or living with J. but did not do so even though she was reminded six times. And one dwelling was also unsuitable because painting and cleaning supplies lined the living room walls.

Appellant had not prepared to care for J. Appellant did not purchase the necessary supplies to care for a child. The extent of appellant's preparations for J.'s possible return home included purchasing a bassinet that J. would quickly outgrow. Even after the Department changed its goals from return to home and relative placement to adoption and termination of parental rights, appellant did not establish plans for J.'s long-term care. This was problematic in light of the fact that appellant and Lopez worked during the nighttime and daycares often do not provide nighttime care. In addition, relative placement was not possible. The Sandovals and appellant's mother expressed interest in caring for J.; neither were appropriate choices. The Sandovals had been the "safety monitors" for appellant's eldest children but were unable to

prevent their placement in foster care, and appellant's mother withdrew her interest after becoming pregnant.

Appellant did not improve upon the continuing concerns of her parenting. Department employees conducting visitations observed appellant's inability to maintain proper supervision of all three of her children. On one occasion prior to J.'s birth, appellant was unaware that Jo. defecated himself until a Department employee informed her. On one occasion after J.'s birth, appellant left J. strapped in a car seat in the living room, putting her in danger of being stepped on. Before and after J.'s birth, Department employees frequently prompted proper parenting behaviors from appellant; those prompts most often included that appellant keep her children in her line of sight. Department employees commented that they saw no improvement in appellant's parenting abilities.

Appellant attempts to argue that she substantially remedied the conditions placing J. in foster care by attending 13 of 18 parenting classes, finding employment, enrolling in a parenting class, and completing some court-ordered services. The trial court did consider those facts and ultimately ruled that appellant had "certainly not substantial[ly] remed[ied] the conditions that existed at the time the child was placed in foster care."

In its capacity as factfinder, the trial court exercised its broad discretion in making the decisions necessary to guard and to foster the child's best interests. The trial court thoroughly weighed all the evidence, considered the statutory requirements, and supported its determination with the uncontroverted evidence presented. Thus, the trial court did not err in terminating appellant's parental rights under Code § 16.1-283(C)(2).

Affirmed.